VAN TATENHOVE, D.J., delivered the opinion of the court in which MOORE, J., joined. SUHRHEINRICH, J. (pp. 398-403), delivered a separate dissenting opinion.
OPINION
GREGORY F. VAN TATENHOVE,' District Judge.
The events underlying this civil rights action alleging excessive force arose when *387 Oakland County Sheriffs Deputies Claudio Lopez and Christina Maher responded to the natural, at-home death of Plaintiff Michael Kent’s father. Adamant that his father had not wished for life-sustaining procedures, Kent vehemently objected to emergency medical technicians’ efforts to attach an Automated External Defibrillator to resuscitate his father. When Kent yelled at the deputies and refused to calm down as commanded, he was tased. This action pursuant to 42 U.S.C. § 1983 followed. The district court found that the deputies’ use of the taser was objectively unreasonable and violated clearly established law, and it denied the deputies’ motion for summary judgment on qualified and governmental immunity grounds. We reach the same conclusions and affirm.
I
Michael Kent lives in Commerce Township, Michigan, with his wife and young children. A few days before the incident in question, Kent’s parents Rick and Pamela traveled from out of state for a visit and were staying with the family in Kent’s home. Kent’s father suffered from a number of serious health problems for several years, and he spent the majority of his visit in bed in significant pain. On the morning of September 1, 2013, Kent, who happens to be a physician, found that his father was “unresponsive to any stimulus” but still breathing with a carotid pulse. He knew at that point that his father was dying. Rick Kent had executed a living will, which provided that he did not want his life “artificially prolonged by life-sustaining procedures.” In accordance with his father’s wishes, Kent made his father as comfortable as possible in the guest bedroom. At 7:08 p.m. that evening, Kent determined that his father had passed away: he was no longer breathing and carried no pulse, and his pupils were fixed and dilated. Kent’s wife called the non-emergency dispatch to report the natural death.
Firefighter-EMT Anthony Oryszczak arrived around 7:30 p.m. and was directed to the upstairs bedroom. Oryszczak briefly examined the body and asked whether a hospice nurse was present. Kent informed Oryszczak that he was a physician and that his father had passed away about fifteen minutes earlier. As Deputy Lopez arrived, EMT Oryszczak asked whether Kent had a do-not-resuscitate order or power of attorney paperwork. Kent explained that his father was visiting from out of state, and he “wasn’t sure if [his] mother had brought any paperwork with her.” He told Oryszczak that his mother had power of attorney, and that it was his father’s wish that no “heroic measures” or attempts at resuscitation be taken upon his death. According to Lopez, Kent’s mother was also asked for any do-not-resuscitate documents. She reiterated that she had power of attorney but did not have the paperwork with her, and she left the bedroom to try to contact a family member who could send the documents.
EMT Oryszczak then radioed for his partner to come assist him in “working] [the patient] up.” When Kent asked what this meant, Oryszczak explained that in the absence of proper do-not-resuscitate paperwork, emergency responders’ protocol required them to attach an Automated External Defibrillator[1] to “determine if *388 there were signs of life” and “do everything” they could for the patient. Kent understood this to mean that the EMTs would take “all measures to resuscitate [Kent’s] father because there was no [do-not-resuscitate order or durable power of attorney].”
The situation escalated at this point. Kent began yelling at the deputies and EMTs, telling them that they “were not going to assault [his] dead father or [he] was going to call the police and have them all thrown in jail.” He questioned whether the EMTs “even knew what a DPOA [durable power of attorney] was” and insisted that his mother, as the medical proxy for his father, could tell them what his father’s wishes were. Deputy Maher arrived around this time and saw that Kent was gesturing with his hands and “flailing” his arms in the air. Deputy Lopez and an EMT recall that Kent called Oryszczak an “asshole” several times, though Kent does not recall this in his witness statement.
At some point, EMT Oryszczak told Deputy Lopez that he “had an obligation to render aid to the deceased,” whom he recalled “did not have obvious signs of death” at that time. Oryszczak asked for the deputies’ assistance and told Lopez he could not perform his duties “because he was in fear of Michael Kent intervening.” The deputies began attempting to deescalate the situation. According to Kent, Deputy Maher “put her hand on her gun and commanded [him] to calm down.” He admits that he refused and told both deputies that “I did not have to calm down, that it was my home and that they were not going to assault my dead father in my home against his wishes.” According to Deputy Maher, Kent also refused to comply with her command to lower his hands, saying, “Don’t you touch me,” although Kent does not recall this in his written statements. Around this time, another EMT on the scene called for back-up officers.
Deputy Lopez recalls that he asked Kent to come downstairs and talk with him. Kent refused, and Lopez says that he then “yelled at Kent that he had to leave the room.” Lopez says Kent told him to “get out of his house,” but Kent does not recall this exchange in his written statements. Lopez then pulled out his taser and told Kent that if he did not calm down,[2] Lopez was going to tase him. Kent, who says he was standing with his hands raised in the air and his back to the wall at this point, undisputedly said, “Go ahead and Taze me, then.” Lopez deployed the taser in dart mode. The prongs struck Kent in the stomach and chest, and he fell to the floor. After the five-second taser cycle, Deputy Maher or *389 dered Kent to present his hands for handcuffing, and he complied. Kent continued to yell at the deputies, asking whether he was under arrest and what laws he had broken. He claims he got no response for several minutes, until deputies finally told him that he was not under arrest.
Kent remained handcuffed, with the ta-ser probes still attached, during fifteen to twenty minutes of questioning by another non-party deputy. EMTs then removed the probes and dressed Kent’s wounds, after which Maher removed the handcuffs. Meanwhile, EMTs “ran a strip” on Kent’s father (presumably conducting an AED initial assessment of the patient’s carotid pulse). He was pronounced dead around 7:45 p.m. The entire incident therefore lasted around twenty minutes or less.
Kent filed suit in the Eastern District of Michigan against Oakland County and Deputies Lopez and Maher on December 10, 2013. He claimed, under 42 U.S.C. § 1983, that the deputies had violated his Fourth Amendment rights. Specifically, he alleged that Deputy Lopez’s use of the taser amounted to excessive force and that Deputy Maher failed to prevent the use of excessive force. He also brought state law assault and battery claims against the deputies. Before any depositions were taken,[3] the deputies moved for summary judgment based on qualified and governmental immunity.
The district court found that there were genuine issues of material fact as to “whether EMS and defendants felt they were faced with an emergency,” whether “emergency personnel had, or even-thought they had, a legal obligation to attempt resuscitation,” and whether “Kent was, in fact, non-compliant.” The court went on to find that Deputy Lopez’s use of force was objectively unreasonable and that case law clearly established that the use of a taser on an individual who was “not under arrest, posed no safety threat to officers or others, made no such verbal threats, was not physically resistant, and may have actually shown physical compliance, constituted excessive force.” It therefore concluded that the deputies were not entitled to qualified and governmental immunity and denied their motion for summary judgment. The deputies appeal that decision.
II
This court has jurisdiction to review a district court’s interlocutory denial of qualified immunity to the extent that the appeal raises issues of law. Stoudemire v. Michigan Dep’t of Corr., 705 F.3d 560, 564 (6th Cir.2013). We do not, however, review a district court’s determination that the record sets forth genuine issues of material fact for trial. Austin v. Redford Twp. Police Dep’t, 690 F.3d 490, 495 (6th Cir.2012) (citing Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). Rather, “a defendant denied qualified immunity may appeal ... *390 [only] if the issue on appeal is whether the plaintiffs, facts, taken at their best, show that the defendant violated clearly established law.” Quigley, 707 F.3d at 680. “The district court’s characterization of the basis for its ruling is not dispositive.” Stoudemire, 705 F.3d at 564.
A denial of summary judgment on the basis of qualified immunity is subject to de novo review. Martin v. City of Broadview Heights, 712 F.3d 951, 957 (6th Cir.2013). In this posture as well, we must “view all evidence, and draw all reasonable inferences, in the light most favorable to [the nonmoving party, Kent].” Goodwin v. City of Painesville, 781 F.3d 314, 320 (6th Cir.2015).
A
In determining whether a law enforcement officer is entitled to qualified immunity on an excessive force claim, we ask two questions: (1) whether the officer violated the plaintiffs constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident. Hagans v. Franklin Cnty. Sheriff’s Office, 695 F.3d 505, 508 (6th Cir.2012). We may conduct this analysis in any order. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
1
Whether an officer’s use of force in effecting an arrest violates the Fourth Amendment turns on “whether the officer[’s] actions are ‘objectively reasonable’ in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In this analysis, we pay “careful attention to the facts and circumstances of ... [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. at 396, 109 S.Ct. 1865 (citations omitted). The ultimate question, however, is “ “whether the totality of the circumstances justifies a particular sort of seizure.’ ” St. John v. Hickey, 411 F.3d 762, 768 (6th Cir.2005) (quoting Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Throughout the inquiry, we must carefully balance “the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. We are to consider “ ‘reasonableness at the moment’ of the use of force, as ‘judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,’ ” Goodwin, 781 F.3d at 321 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865), and we must take into account the fact that police officers “are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Graham, 490 U.S. at 396-97, 109 S.Ct. 1865.
The deputies argue that the first Graham factor, the severity of the offense, is irrelevant since Kent was never charged with any crime. But that fact is precisely what calls Deputy Lopez’s use of a taser into question under this factor. Kent was never arrested and was not told at any time that he was under arrest. See e.g., Grawey v. Drury, 567 F.3d 302 (6th Cir.2009) (finding excessive force where officer pepper sprayed man who was never told he was under arrest; man also fled police but later put his hands against a wall “without any indication of resistance”). *391 Indeed, there is no evidence that Kent was aware that he would be detained until Deputy Lopez instructed him that he would be tased if he failed to comply with commands. See Goodwin, 781 F.3d at 326 (finding excessive force and noting that there was no evidence that the claimant had “reason to be aware he was being detained”). This is one important consideration in the totality-of-the-cireumstanees analysis, and it weighs in Kent’s favor.
The deputies also insist that Kent posed an immediate threat to the safety of those on the scene, but it is difficult to square that claim with our ease law. While Kent may have prevented EMTs from fulfilling their perceived duties, his conduct does not resemble the physical and immediate safety threat we have found in other cases to justify tasing. For example, we have found tasing permissible where an individual was armed. See Watson v. City of Marysville, 518 Fed.Appx. 390 (6th Cir.2013) (holding that tasing did not constitute excessive force where the suspect, who was reported to be armed, reached into bag). In this case, it is undisputed that Kent was unarmed and made no evasive movements to suggest he had a weapon. Further, we have found tasing reasonable where individuals were particularly violent or physically resistant, so as to endanger responders. See Caie v. W. Bloomfield Twp., 485 Fed.Appx. 92, 94 (6th Cir.2012) (plaintiff ran from police while “flailing his arms violently”); Hagans, 695 F.3d at 511 (plaintiff was “out of control and [] forcefully [] resisting] arrest”). There is no evidence that Kent was violently thrashing about in an effort to avoid handcuffing or to flee police, such that he might have harmed the deputies and EMTs in the bedroom. Nor is there any indication that he attempted to hit officers or make a display of force. See Rudlaff, 791 F.3d 638, 640 (6th Cir.2015) (finding tasing reasonable where claimant “puffed out his chest and stared down [the officer],” then swung his arms twice toward officers). At the most, according to Deputy Maher’s account, Kent used agitated hand gestures. Kent’s actions do not, therefore, amount to the same immediate threat to safety found to justify tasing under our case law.
More importantly, we also assume in this interlocutory appeal that Kent had his hands up and his back against the bedroom ‘wall when he was tased. We have held that an individual poses little threat of harm when her hands are in the air indicating submission. Grawey, 567 F.3d at 311 (finding excessive force where an individual approached an officer and initially refused to obey commands to lower his hands, but later had his hands against a wall in submission when the officer pepper sprayed him); Correa v. Simone, 528 Fed.Appx. 531 (6th Cir.2013) (finding no immediate threat of harm, and ultimately finding excessive force, where arrestee — who was armed — had put his hands in the air, ceased resisting, and made no evasive movements); Thomas v. Plummer, 489 Fed.Appx. 116, 126 (6th Cir.2012) (finding that arrestee who had dropped to her knees and raised her hands over her head posed “absolutely no threat to [the officer’s] or any other officer’s safety”). Sitting in the “ ‘peace of a judge’s chambers,’ ” we take seriously an officer’s objectively reasonable belief that an arrestee posed an immediate threat to the officer’s safety or the safety of others. Graham, 490 U.S. at 396, 109 S.Ct. 1865 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)). But once Kent ceased flailing his arms and assumed this posture, he indicated submission or, at the very least, minimized any immediate safety threat he might have posed to the deputies and emergency responders in the bedroom.
*392 That submissive posture also undermines the deputies’ argument that Kent was “actively resisting arrest.” We have often found that the reasonableness of an officer’s use of a taser turns on active resistance: “When a suspect actively resists arrest, the police can use a taser [ ] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.” Rudlaff, 791 F.3d at 642. Compare, e.g., Hagans, 695 F.3d at 511 (holding that officer did not violate clearly established law when he used taser five times in drive stun mode to subdue plaintiff, who refused to be handcuffed, fled from officers, and was “out of control,” breaking windows and jumping on top of cars due to what officers later learned was crack cocaine intoxication); Foos v. City of Delaware, 492 Fed.Appx. 582 (6th Cir.2012) (finding that use of taser was reasonable in response to hostile, belligerent, and agitated suspect, who repeatedly revved the engine of his wrecked car as officers arrived on the scene, then began violently thrashing about and reached into back of his vehicle as if to retrieve a weapon), with, e.g., Goodwin, 781 F.3d 314 (finding excessive force where suspect, still convulsing from a previous taser application and physically unable to comply with commands to put his hands behind his back and therefore not “actively resisting” arrest, was tased a second time); Thomas, 489 Fed.Appx. 116 (finding excessive force where the plaintiff had ceased her verbal resistance and dropped to her knees with her hands above her head at the time she was tased); Kijowski v. City of Niles, 372 Fed.Appx. 595 (6th Cir.2010) (finding excessive force since individual could not have “actively resisted” police in between a rapid series of taser applications); Landis v. Baker, 297 Fed.Appx. 453 (6th Cir.2008) (finding that officers used excessive force on suspect who had initially fled but, at the time of the officers’ repeated tasing, was pinned to the ground with his face in muddy water and ultimately died as a result of drowning). “Active resistance includes ‘physically struggling with, threatening, or disobeying officers.’ ” Rudlaff, 791 F.3d at 641 (quoting Cockrell, 468 Fed.Appx. at 495). It also includes “refusing to move your hands for the police to handcuff you,” id. (citing Caie, 485 Fed.Appx. at 94), or fleeing from police. See, e.g., Williams v. Ingham, 373 Fed.Appx. 542 (6th Cir.2010) (holding that use of taser in drive stun mode on arrestee who had twice engaged in high-speed car chases with police was reasonable, where, once stopped, arrestee refused to exit his vehicle for handcuffing).
Citing Eldridge v. City of Warren, 533 Fed.Appx. 529 (6th Cir.2013), the deputies insist that Kent was actively resisting arrest because he refused to comply with their commands to calm down and demonstrated “verbal hostility.” Id. at 535. After comparing and contrasting taser cases from this circuit, the Eldridge court noted that active resistance could be characterized as “noncompliance” that is coupled with “some outward manifestation — either verbal or physical — on the part of the suspect [that] suggests] volitional and conscious defiance.” Id. at 534. One case the Eldridge Court considered, Caie v. West Bloomfield Township, 485 Fed.Appx. 92 (6th Cir.2012), provides a useful comparison here. The plaintiff in Caie was a suicidal and heavily intoxicated young man who had escaped from the care of relatives and rowed out to the middle of a lake with the reported intention of killing himself. The young man complied with officers’ orders to get out of the water, but once onshore, he behaved erratically and commented repeatedly that he “should fight the officers so that they would have a reason to kill him.” Id. at 94. Concerned that the plaintiffs resistance could escalate into violence, the officers decided to forci *393 bly secure the young man in order to transport him to a hospital for mental health treatment. They were able to partially hold him on the ground, but when he continued to resist by refusing to move his hands for handcuffing, an officer applied a taser in drive stun mode. Judge Donald, writing for the panel, emphasized that plaintiffs highly agitated and intoxicated state, his demonstrated suicidal tendencies, his attempts to flee, and, in particular, his verbal threats of physical violence presented a strong risk to the safety of the officers and the plaintiff himself. Id. at 96-97. Under this combination of facts, the court found the officers’ use of the taser to be reasonable.
Judge Donald also wrote for the majority in Eldridge and found that Caie contrasted sharply with that case. In El-dridge, the police confronted an erratic driver, who they later discovered was in the midst of a diabetic hypoglycemic episode. Despite several commands to exit his vehicle, the driver did not move and repeatedly said, “I’m fine, thank you,” until officers forcibly removed him from the car and tased him multiple times. Eldridge, 533 Fed.Appx. at 530-31. The court concluded that the use of a taser in response to Eldridge’s passive resistance amounted to excessive force. Not only were El-dridge’s verbal statements distinguishable from the direct threats of physical violence seen in Caie, but Eldridge also displayed no deliberate physical defiance and had “played no role in escalating the aggression.” Id. at 535.
We recently contrasted these two cases again in Goodwin v. City of Painesville, 781 F.3d 314 (6th Cir.2015). In Goodwin, officers initially responded to a noise complaint from a loud party in claimant David Lee Nall’s apartment in 2010. Sometime after the officers gave Nall a warning, a guest leaving the party told them that Nall was “crazy” and had threatened to kill the guests and the police. Id. at 319. Intending to arrest Nall for disorderly conduct, the officers returned to his apartment and asked him to step outside. Nall refused, told them he did not have to step outside, and closed the door. Id. The officers then kicked the door open and tased Nall in dart mode for an unusually long period of twenty-one seconds, then again in drive stun mode. The court held that the officers had used excessive force in the first tasing, since “Mr. Nall’s single statement that he would not leave his apartment, or the fact that he remained in his apartment rather than exiting, does not in itself render [the officer’s] use of the Taser reasonable.” Id. at 324. Nall’s “passive refusal” to comply with the officers’ commands was “more akin to the suspect’s refusal to exit his car in Eldridge than to the continued resistance and hostility present in the active resistance cases, such as Caie, that Eldridge distinguishes.” Id. at 325-26.
The combination of facts that made the use of force reasonable in Caie is not present here. Kent admits that he did not fully comply with the deputies’ orders to calm down. He also admits that he yelled at officers that he “did not have to calm down,” that the emergency personnel “were not going to assault [his] dead father or [he] was going to call the police and have them all thrown in jail,” and that he responded to Deputy Lopez’s final warning with, “Go ahead and Taze me, then.” Kent’s language might not resemble the “polite responses” given in El-dridge, but it does not approach the direct threat of physical harm made by the plaintiff in Caie. And unlike Caie, Kent never attempted to flee officers, and he never attempted to prevent officers from handcuffing him. Rather, much like the claimant in Goodwin, who, like Kent, refused to comply with an officer’s command and verbally indicated as much, Kent’s conduct *394 does not resemble the “continued resistance and hostility” often present in our active resistance cases, including Caie. Goodwin, 781 F.3d at 325-26.
We are keenly aware that, at the time of the incident, the deputies understood that they were obligated to secure the scene so that EMTs could perform their perceived duties,[4] and that the deputies were forced to “make split-second judgments [ ] in circumstances that [were] tense, uncertain, and rapidly evolving.” Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. Indeed, distinct circumstances in this fact-sensitive analysis might compel a different conclusion about police use of force in a perceived medical emergency. For example, in Strieker, we upheld the officers’ use of force — pointing weapons, using pressure holds, and handcuffing — where they were responding to a possible drug overdose of a young man known to officers as a drug user, after his parents had repeatedly refused to allow the officers or emergency responders to enter their house to treat him. E.g., Stricker v. Township of Cambridge, 710 F.3d 350 (6th Cir.2013). But Strieker did not involve a tasing, and Deputies Lopez and Maher were confronted with a very different scenario than the Strieker responders. Here, the deputies knew they were responding to a natural death investigation and were aware that Kent’s father had just passed away some fifteen minutes before they arrived. See, e.g., Griffith v. Coburn, 473 F.3d 650, 658 (6th Cir.2007) (taking into account the fact that officers were aware that the suspect was “experiencing some sort of mental or emotional difficulty,” where mother had called 911 seeking advice about having him hospitalized); see also Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir.2004) (citations omitted) (“The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.”).
They were also well aware — perhaps most importantly — that the entire incident occurred in Kent’s home, one of the most sacred of spaces under the Fourth Amendment’s protections. Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734) (1961) (“ ‘At the very core’ of the Fourth Amendment ‘stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.’ ”); see also Goodwin, 781 F.3d at 327 (turning to the “central purpose of the Fourth Amendment” to hold that Nall’s refusal to exit his home, without more, did not constitute active resistance). Of course, officers are not precluded from using reasonable force in that setting, and it can sometimes be justified in the face of active resistance or an imme *395 diate threat to the safety of officers or others. E.g., Stricker, 710 F.3d 350 (finding forcible entry and pointing of weapons in home reasonable in response to perceived flight from officers and continued refusal to permit officers and EMTs to aid individual in drug overdose); see also, e.g., Carpenter v. Gage, 686 F.3d 644, 647 (8th Cir.2012) (finding the use of a taser reasonable where, when officers responded with paramedics to a 911 call for medical aid at plaintiffs home, plaintiff threatened them with a baseball bat and officers were told by the caller that plaintiff had á gun). Those circumstances, however, were largely absent when Kent was tased in his guest bedroom. Carefully balancing the unique facts presented in this totality-of-the-circumstances analysis, we conclude that “the nature and quality of the intrusion on [Kent’s] Fourth Amendment interests]” outweighs “the countervailing governmental interests at stake.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. Deputy Lopez’s use of a taser was objectively unreasonable here.
2
The second question in the qualified immunity analysis asks whether, at the time of the incident in September 2013, it was clearly established that Kent had a right not to be tased under these circumstances. The doctrine of qualified immunity “gives government officials breathing room to make reasonable but mistaken judgments,” and “protects ‘all but the plainly incompetent or those who knowingly violate the law.’ ” Stanton v. Sims, — U.S. -, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011); Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); Mullenix v. Luna, 577 U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015). An officer violates clearly established law and loses that immunity when, at the time of the challenged conduct, “ ‘[t]he contours of [a] right are sufficiently clear’ that every ‘reasonable official would have understood that what he is doing violates that right.’ ” al-Kidd, 131 S.Ct. at 2083 (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court “ ‘do[es] not require a case directly on point’ before concluding that the law is clearly established, ‘but existing precedent must have placed the statutory or constitutional question beyond debate.’ ” Stanton, 134 S.Ct. at 5 (quoting al-Kidd, 131 S.Ct. at 2083); Mullenix, 136 S.Ct. at 308; Rudlaff, 791 F.3d at 643 (“[E]xisting case law ... must put the precise question ‘beyond debate.’ ” (quoting al-Kidd, 131 S.Ct. at 2083)). The law is clearly established when the plaintiff can point either to “cases of controlling authority in his jurisdiction at the time of the incident,” or “a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.” Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); see also, e.g., al-Kidd, 131 S.Ct. at 2083-84 (applying the standard from Wilson); Sheehan, 135 S.Ct. at 1776-78 (same).
The deputies first argue that this inquiry must be limited to the “community caretaker” context and emphasize that no case has expressly prohibited the use of a taser when officers are securing a scene for emergency personnel. This narrow definition, however, is contrary to guidance from the Supreme Court and this Circuit. The Supreme Court'has “repeatedly” cautioned that courts should not define the right in question with a “high level of generality,” but should instead base their analysis on a reasonably particularized definition. al-Kidd, 131 S.Ct. at 2084. In *396 deed, we have noted that an overbroad definition is not only unhelpful, but doctrinally problematic: “If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry always to answer the clearly established inquiry.” Hagans, 695 F.3d at 508. An overly. restrictive definition like the one the deputies promote also poses problems: “If it defeats the qualified-immunity analysis ,to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).” Id. Indeed, the Supreme Court “do[es] not require a case directly on point.” al-Kidd, 131 S.Ct. at 2083; see also St. John, 411 F.3d at 774 (noting that reviewing courts are not restricted to the precise “factual context of a prior case”). Confining the clearly-established inquiry to “community caretaker” cases risks undermining the purposes of § 1983 and conflicts with clear directives from the Supreme Court.
With those directives in mind, we turn to whether, in September 2013, it was clearly established that it was excessive force to tase an individual who refused to comply with officers’ commands to calm down and yelled at emergency responders, but was never told he was under arrest, never demonstrated physical violence, and had his arms in the air and his back to the wall when tased. Under recent precedent assessing the state of the law in 2010, we must answer that question in the affirmative.
It is clearly established in this Circuit that “the use of a Taser on a nonresistant suspect” constitutes excessive force. Kijowski, 372 Fed.Appx. at 601. Conversely, it is also clearly established that tasing a suspect who “actively resists arrest and refuses to be handcuffed” does not violate the Fourth Amendment. Ha-gans, 695 F.3d at 509. Relying again on Eldridge’s statement that active resistance involves “noncompliance ... paired with [ ] signs of verbal hostility,” Eldridge, 533 Fed.Appx. at 535, the deputies argue it was clearly established that Kent’s failure to comply with commands to. calm down amounted to “physical defiance” and his shouts at the deputies and EMTs amounted to “verbal belligerence,” such that he was “actively resisting arrest.” But in Goodwin, we recently rejected that very argument. Instead, we held that, as of June of 2010, it was clearly established that the use of a taser in response to very similar behavior — refusing to comply with commands to leave an apartment and saying as much to officers, when the claimant was never told he was under arrest and posed little safety threat to officers — constituted excessive force. 781 F.3d at 326. If the claimant in Goodwin had a clearly established right to be free from the use of a taser in 2010, then it must be said that Kent had the same clearly established right in September 2013.
We have also held that, since mid-2005, “[t]he general consensus among our cases is that officers cannot use force ... on a detainee who has been subdued, is not told he is under arrest, and is not resisting arrest.” Grawey, 567 F.3d at 314 (citations omitted); see also, e.g., Thomas, 489 Fed.Appx. 116, 125 (holding it was clearly established that an “officer’s tasing a once-disobedient suspect who has stopped resisting constituted excessive force, as of August 23, 2009”). As we have noted, Kent was never told he was under arrest, and — like the claimant in Goodwin — there is no evidence that he had reason to believe he was being detained. Goodwin, 781 F.3d at 326. In this interlocutory *397 appeal, we also accept Kent’s account that his arms were raised and his back was against the bedroom wall just before he was tased. Again, that posture indicated submission or, at the very least, minimized any safety threat he posed to those on the scene. Accepting Kent’s version of the facts and based on the law before us, we must conclude that Kent — a man who yelled at officers and refused to comply with commands to calm down, but was never told that he was under arrest, never demonstrated physical violence, and had his arms in the air and his back to the wall when tased — had a right to be free from the use of a taser under these circumstances, and in September 2013, “‘[t]he contours of [that] right [were] sufficiently clear’ ” to the deputies.
In his thoughtful dissent, Judge Suh-rheinrich suggests that we should look to guidance in the Eleventh Circuit with respect to the facts that give rise to a constitutional deprivation. But surely it demands too much from law enforcement personnel to be aware of the “clearly established” holdings of other circuits. Where Sixth Circuit law is clear, it controls. Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir.2002) (“In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.”).
B
A few other matters remain. Deputy Maher, first, is not entitled to qualified immunity in Kent’s inaction claim. Since Deputy Lopez’s use of the taser under these facts constituted excessive force in September 2013, it follows that Maher “had reason to know that excessive force would be or was being used.” Goodwin, 781 F.3d at 328 (citing Turner v. Scott, 119 F.3d 425, 429 (6th Cir.1997)). Maher also had “the opportunity and the means to prevent the harm from occurring.” Id. She was in the bedroom for the majority of the incident, communicated with Lopez as the events unfolded, and was facing Kent when she heard Lopez warn Kent that he would use the taser. She was close enough to handcuff Kent immediately after the taser was deployed. Contra Turner, 119 F.3d at 429-30 (finding that plaintiff could not establish an inaction claim where officer was not facing the arrestee when another officer used force, and did not communicate with the other officers beforehand). Kent has presented sufficient evidence to give rise to a jury question as to whether a reasonable officer in Maher’s position would have observed Deputy Lopez’s use of the taser and would have taken action to prevent Lopez from applying it. Goodwin, 781 F.3d at 329.
The same is true of Kent’s state law assault and battery claims. Since it was clearly established that the use of a taser under these circumstances constituted excessive force, Deputies Lopez and Maher cannot show that their conduct was “undertaken in good faith” and without a “wanton or reckless disregard of the rights of another.” See Odom v. Wayne Cnty., 482 Mich. 459, 760 N.W.2d 217, 228 (2008) (citations omitted); Scozzari v. City of Clare, 723 F.Supp.2d 974, 978 (E.D.Mich. 2010) (citing Odom, 760 N.W.2d at 225), aff'd sub nom. Scozzari v. Miedzianowski, 454 Fed.Appx. 455 (6th Cir.2012); see also Mich. Comp. Laws § 691.1407(3). The deputies are not entitled to governmental immunity under Michigan law. Finally, the deputies’ challenges to the district court’s factual determinations have no place in this de novo, interlocutory appeal.
Ill
For these reasons, we AFFIRM the district court’s decision denying the deputies qualified and governmental immunity.

. An AED is a portable electronic device used by emergency responders to restore a patient’s heart to a normal rhythm after a sudden cardiac arrest. How Does an Automated External Defibrillator Work?, Nat. Insts. Health, Nat. Heart, Lung, & Blood Inst., http:// www.nhlbi.nih.gov/health/healthtopics/topics/ aed/howdoes (last visited July 23, 2015). Emergency responders attach electrodes ("sticky pads with sensors”) to the patient’s *388 chest. Id. These electrodes detect the patient's heart rhythm, and a computer analyzes that information to determine whether an electric shock is necessary. If a shock is needed, the AED's computer will prompt the emergency responder when to push a button to administer the shock, which is delivered through the electrodes. Id. A shock can restore the heart’s normal rhythm, "if done within minutes of the onset of [sudden cardiac arrest].”. .When Should an Automated External Defibrillator Be Used?, Nat. Insts. Health, Nat. Heart, Lung, & Blood Inst., http:// www.nhlbi.nih.gov/health/health-topics/ topics/aed/when (last visited July 23, 2015).

. Lopez says that he told Kent that he would use the taser if Kent did not leave the room. But no other written statements from those [1] on the scene recall that Kent was commanded to leave the room. In this interlocutory appeal of a denial of qualified immunity, the Court views the evidence and draws all reasonable inferences in the light most favorable to the plaintiff. Quigley v. Tuong Vinh Thai, 707 F.3d 675 (6th Cir.2013); Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 496 n. 7 (6th Cir.2012). We therefore assume that Kent was commanded to calm down, and was not ordered to leave the room.

. The district court relied on witness statements and incident reports in resolving the summary judgment motion. One of those documents is an unsworn, unsigned, and undated narrative statement, presumably authored by Michael Kent. While the Federal Rules no longer require a formal affidavit for summary judgment motions, some "written unsworn declaration, certificate, verification, or statement ... subscribed by [the declarant ] as true under penalty of perjury” is still required. 28 U.S.C. § 1746 (emphasis added). Because the deputies offered this document as an exhibit to their own motion, however, any objection they may have had was waived, and we may consider the defective declaration for purposes of this appeal. Wiley v. United States, 20 F.3d 222, 226 (6th Cir.1994); 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2738 (3d ed.1998).

. The district court and the parties' briefs focused extensively on whether, under substantive Michigan law, relevant city ordinances, and local EMT policies and procedures, there was indeed an emergency or a duty to administer the AED. The deputies, however, are correct that regardless of whether an ongoing medical emergency existed, the Court must judge their conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. The district court’s substantive analysis of emergency protocols is, ultimately, off-point: "[Wjhat matters is the reasonableness of the officers' belief[,j as they 'did not [know] and could not have known' " whether the use of the AED was actually required under county protocol. Pollard v. City of Columbus, 780 F.3d 395, 403 (6th Cir.2015) (citations omitted). Because EMT Oryszczak told the deputies that he had a duty to render aid to Kent’s father and attach the AED, the deputies understood — rightly or wrongly— that their duty was to ensure that the firefighters could perform that task. We therefore view the incident from that vantage point.