NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0184n.06

Case No. 25-5733

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 23, 2026
KELLY L. STEPHENS, Clerk

|  |  |
|---|---|
| MARK W. EURTON, JR. and LAUREN E. WHISMAN, | ) ) ) |
| Plaintiffs - Appellants, | ) |
| | ) |
| v. | ) |
| | ) |
| PARKER THOMAS, et al., | ) |
| Defendants - Appellees. | ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

OPINION

Before: McKEAGUE, LARSEN, and RITZ, Circuit Judges.

**RITZ, Circuit Judge**. Police officers conducted a welfare check on Mark Eurton after Eurton called family members, threatening self-harm. Equipped with a dispatch warning that Eurton was intoxicated, possibly armed, and likely to become violent, the officers encountered Eurton at the entrance to his home, along with his visibly upset wife. The officers drew their weapons and forcibly entered the home after Eurton refused to engage with them.

Eurton and his wife sued the officers and Oldham County, Kentucky. The district court dismissed their claims against Oldham County and later granted summary judgment to the officers based on qualified immunity. We affirm.

BACKGROUND

I.      Facts

On February 11, 2022, Mark Eurton contacted his mother and estranged sister to tell them that he loved them and that "he [was] going to sleep because he ha[d] taken so many things."

RE 38-1, Dispatch Report, PageID 415-16. Understanding this as a suicide attempt, Eurton's family called 911 and asked police to conduct a welfare check. Eurton's family also told the dispatcher that Eurton had just gotten into a fight with his wife Lauren Whisman, who had separated from him a month before; neglected his medication for bipolar disorder; and likely had a gun at home.

Dispatch sent police officers Parker Thomas and Kimberly Gunsett to Eurton's home, and officer Tyler Covington also responded to the call. As the officers were on the way, dispatch relayed the information from the 911 call, adding that Eurton likely had been drinking and "possibly took two bottles of unknown prescription pills." RE 35-6, Covington Report, PageID 346. Additionally, dispatch warned that there was an "alert on the residence" because "Eurton [did] not like police" and was likely to become violent. RE 35-4, Covington Dep., PageID 337.

When Thomas arrived at Eurton's residence, he found Eurton standing in the doorframe smoking a cigarette. Thomas explained why he was checking on Eurton, and Eurton replied he had called his family because it was Valentine's Day weekend and he wanted to tell them that he loved them. When Thomas asked if Eurton had any thoughts of hurting himself, Eurton responded, "Hell no." RE 38-3, Thomas Bodycam, 1:20-28. Whisman then came out of the home, speaking to someone on her cell phone and holding up her finger in a "wait" gesture. Whisman asked Eurton, "Your sister's on the phone right now, who did you call?" *Id.* 1:43-55. When Thomas asked Whisman if she was okay, she started crying and said "no" before turning quickly back to Eurton and asking, "What did you do?" *Id.* 1:55-2:07.

Thomas and Covington, who had arrived during this interaction, walked toward the house. At once, Eurton began backing into the house and closing the door in front of him while keeping a hand in the pocket of his pants. Thomas said, "No, no, we're not doing that," "we're gonna talk."

*Id.* 2:19-22. Whisman reached out to prevent the door from closing and gasped as Eurton forcefully shut the door. Thomas immediately forced the door back open with his shoulder, damaging the latch, and he and Covington drew their weapons (a gun and a taser, respectively), yelling for Eurton to put his hands up. Eurton complied, calmly raising his hands and asking the officers what he had done. The officers' weapons were pointed at Eurton for a total of about seventeen seconds, during which Whisman became increasingly distraught.

Thomas and Covington then asked Eurton to turn around, at which point he became agitated, demanding to know if the officers had a warrant. Eurton did not comply with the officers' instructions and instead began to reach in his pocket again, at which point Thomas repeated his command for Eurton to take his hand out of his pocket. Eurton said, "Kill me, then," to which Covington replied, "We're not here to do that, we're trying to make sure you're okay." *Id.* 3:00-05. Eurton asked for his lawyer and said he wanted to reach into his pocket to call his attorney, but he continued to disregard the officers' requests that he approach them to be patted down.

Thomas and Covington stepped into Eurton's home and he ordered them to leave, yelling that their actions were unconstitutional. Thomas asked why Whisman was crying, to which Eurton responded, "Because she thinks that I did something stupid because I drank three beers." *Id.* 3:44-50. As Thomas and Covington stood in place, Eurton became increasingly aggressive, swearing at the officers and threatening them with lawsuits, ordering them to leave, and slurring his speech. Eurton began rummaging in his pockets, prompting the officers to command him again to keep his hands out of his pockets, to which Eurton shouted, "Shoot me, then!" *Id.* 4:20-30. Eurton retreated further into his house and the officers followed him at a distance, still asking to talk as Eurton shouted angrily and repeatedly challenged the officers to assault him. Thomas told Eurton that he and Covington would leave once he spoke with them; they also reassured Eurton that he was not

under arrest. As Eurton yelled at Thomas and Covington to leave, they explained that they were acting for their own safety in addition to his.

This pattern continued for about twelve minutes. Eventually, Thomas and Covington's supervisor, Sergeant Jared Ellison, arrived. Ellison largely "fail[ed] to communicate" with the "irate" and "hostile" Eurton. RE 38, Pl.'s Resp. to Defs.' MSJ, PageID 395. After Eurton disappeared into another room in the house, Ellison asked Thomas if he "ha[d] anything." RE 38-3, Thomas Bodycam, 15:20-24. Thomas responded, "No," and the officers left. *Id.* 15:23-40.

## II.     Procedural history

Eurton and Whisman sued Thomas, Covington, and Oldham County under 42 U.S.C. § 1983 for unlawful warrantless entry, excessive force, and improper arrest or detainment. They also levied a variety of state law claims, including assault, false arrest or imprisonment, intentional infliction of emotional distress, trespass to land, and negligence per se. Upon the defendants' motion to dismiss, the district court dismissed the plaintiffs' official capacity claims against Thomas and Covington and all claims against Oldham County but declined to dismiss the individual capacity and state law claims.

After discovery, Thomas and Covington moved for summary judgment, which the district court granted. The court found that, based on the information provided to Thomas and Covington by 911 dispatch, Whisman's distraught behavior, and Eurton's own actions, the defendants were entitled to qualified immunity on each of the federal claims. The court also concluded as to the state claims that Thomas and Covington's actions were protected by qualified official immunity under Kentucky law.

Eurton and Whisman now appeal. For brevity, from this point on, we refer to Eurton and Whisman's joint suit using only Eurton's name.

**ANALYSIS**

**I.      Standard of review**

This court reviews a district court's grant of summary judgment on qualified immunity grounds de novo.  *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view all evidence in the light most favorable to the nonmoving party, but "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 255 (1986).

**II.     Eurton's federal claims**

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  So recovery under § 1983 requires Eurton to show that (1) Thomas and Covington violated one of his constitutional rights, and (2) the right was clearly established when it was violated.  *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (per curiam).  When the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," the right is clearly established.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Usually, this requires a plaintiff to "point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered."  *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).  And "courts of appeals [are] permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances" at hand. *Pearson*, 555 U.S. at 236.

Eurton argues that Thomas and Covington violated his Fourth Amendment rights when they entered his home without a warrant, used excessive force against him, and arrested him without probable cause. We reject his arguments and affirm as to all three claims.

### A. Warrantless home entry

Eurton argues that Thomas and Covington unlawfully entered his home. He also argues that the district court disregarded relevant facts related to the presence of exigent circumstances during the incident. Eurton's arguments are unavailing.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court warns that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," making warrantless home entries "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (citation modified). But the presumption is not absolute. Warrantless entries are permissible if "exigent circumstances" justify the entry. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992).

One recognized exigency, known as the "emergency aid exception," permits police to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 402-03 (2006). Relatedly, exigent circumstances exist where a suspect poses "an immediate threat to the arresting officers and public" such that "immediate and serious consequences" would occur if police left to get a warrant before acting. *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (citation modified).

The Supreme Court recently reaffirmed *Brigham City* in the suicide-prevention context, explaining that a warrantless entry to prevent a suicide does not require probable cause, because "[t]he probable-cause requirement is rooted in, and derives its meaning from, the criminal" investigation context. *Case v. Montana*, 146 S. Ct. 500, 503 (2026). Officers therefore need only "an objectively reasonable basis for believing" that the "homeowner intended to take his own life." *Id.* (quoting *Brigham City*, 547 U.S. at 400).

Here, Eurton alleges that no exigency justified Thomas and Covington's entry into his home, and he takes issue with the district court's factual description of the incident. Eurton claims that, contrary to the district court's description, Whisman was not outside the home until a few minutes after the officers arrived, and she was "not in evident distress until some time after the officers had arrived." CA6 R. 15, Appellant Br., at 30. Eurton believes that jurors "could determine that [his] answers to Thomas's questions objectively allayed any suspicion of self-harm, and that a single utterance from [Whisman] . . . afforded the officers no probable cause or exigent circumstance[s]" for their warrantless entry. *Id.* at 31-32.[1]

Again, suicide prevention is an exigency under the emergency aid exception. *See Case*, 146 S. Ct. at 508-09. And we have found such an exigency even where a subject did not clearly appear suicidal to officers. To illustrate, in *Monday v. Oullette*, we held that a police officer had

---

[1] Eurton also argues that the district court erred by failing to consider the report of his expert, David Jude. But, as Thomas and Covington explain, Jude's report failed to incorporate crucial evidence into its analysis. According to Jude, "Police Officers responded to home of Mark Eurton and Lauren Whisman for a 'welfare check.' No other information was provided to the officers suggesting the call for service was in any way criminal in nature." RE 38-13, Jude Report, PageID 475 (citation modified). Jude's statement omitted the information that dispatch provided to Thomas and Covington about Eurton's history with the police and his actions on the night of the incident. Because Jude's conclusions were based on incomplete information, the district court did not err in omitting the report from its analysis. *See DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 427 (6th Cir. 2006) (holding that a district court does not err where it declines to consider expert reports that "refus[e] to acknowledge the uncontroverted facts").

probable cause to conduct a warrantless seizure where the plaintiff had "telephoned a mental health worker and stated that he . . . had ingested some pills and was drinking alcohol in an effort to commit suicide." 118 F.3d 1099, 1102 (6th Cir. 1997). Although the plaintiff "appeared coherent and denied that he was attempting to commit suicide" when the officer arrived, the officer testified that "based upon his experience in responding to suicide attempts, people who have overdosed exhibit no typical behavior, the absence or presence of which will indicate reliably [his] true condition." *Id.* We concluded that "given [the officer's] information and the great potential harm at issue, an unacceptable risk remained that [the] plaintiff was deceiving him in order to attain his" goal. *Id*. at 1103.

*Case*, *Brigham City*, and *Monday* support the district court's finding of qualified immunity here. The cases counsel that preventing self-harm is a cognizable exigency. They also insinuate that a plaintiff's apparent initial coherence or absence of immediately obvious, dangerous behavior does not preclude an exigency finding, particularly when police have other relevant information about the plaintiff's condition. In Eurton's brief initial interaction with Thomas and Covington, he did not immediately appear distressed. But, as in *Monday*, the officers had information about Eurton's condition and threats of suicide from his family members, and the officers heard Eurton's wife ask what he had done. On these facts, the police had an "objectively reasonable basis for believing" that he posed a danger to himself. *Case*, 146 S. Ct. at 503.

Eurton points out that, contrary to the district court's opinion, Whisman was inside the house when the officers arrived and was "not in evident distress" until after their arrival. CA6 R. 15, Appellant Br., at 30 (citing RE 41, Mem. Op. & Order, PageID 527-28). Additionally, Eurton claims that the district court "discount[ed]" the fact that he answered Thomas's questions in a "measured, non-threatening tone" for nearly two minutes. *Id.*

But Eurton's factual clarifications do not move the needle. Although we read the facts in Eurton's favor on summary judgment review, *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009), the officer's perspective still guides the qualified immunity analysis, *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). Here, Thomas and Covington responded to a welfare check on a possible suicide victim who had been drinking and apparently ingested two bottles of unknown pills, neglected his mental health medication, was likely to become violent with police, and might be armed. When Thomas arrived, Eurton stood alone in his doorframe, smoking a cigarette, and calmly reassured Thomas that he was okay. As Covington arrived, Whisman came out of the house, asking her husband what he had done. When asked if she was okay, Whisman began to cry and responded that she was not. And as soon as the officers tried to speak to the couple further, Eurton backed into his house and forcefully closed the door while putting his hand into his pocket. All of this occurred *before* the officers' entry into Eurton's home. The "totality" of these circumstances suffices for Thomas and Covington to receive qualified immunity for their warrantless entry. *Case*, 146 S. Ct. at 508 (citation modified).

Our decision in *Reed v. Campbell County* is instructive. 80 F.4th 734 (6th Cir. 2023). There, we affirmed a denial of qualified immunity where officers made a warrantless entry after a neighbor called 911 to report that he might have heard a domestic dispute. *Id.* at 740-41. But the officers "did not see or hear anything amiss" when they arrived at Reed's home, and when Reed answered the officer's knock, the woman standing behind him "was not crying" or injured. *Id.* at 740. Reed eventually closed the door after learning that the officers had no warrant. *Id.* at 741. An officer then kicked down Reed's door, drew his firearm on Reed, and patted him down. *Id.* This court held that a "911 call alone is insufficient to justify . . . warrantless entry," particularly where officers "heard nothing and saw nothing amiss" and "saw no one who appeared to be injured

or upset." *Id.* at 744. We distinguished the entry in *Reed* from cases in which "the 911 caller made a significantly more detailed report" or where "there were other indications" of an emergency. *Id.*

Although Eurton asks this court to rely on his initial calm during the incident to deny qualified immunity to the officers, *Reed* instructs otherwise. Thomas and Covington responded to a detailed 911 call from Eurton's own family, combined with a dispatch warning that Eurton was likely intoxicated, possibly armed, and expected to react violently to police presence. Furthermore, when the officers arrived, Whisman was emotional, told the officers that she was not okay, and asked her husband what he had done. *Reed* makes clear that officers need not see "outward manifestations of violence" to find exigency where other circumstances are at play. *Id.* at 745 (citation modified). And although Eurton is correct that "the mere presence of firearms does not create exigent circumstances," CA6 R. 15, Appellant Br., at 33 (quoting *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)), a showing "that the police possessed information that the suspect was armed and likely to use a weapon or become violent" suffices, *Barton*, 949 F.3d at 948-49 (citation modified). Here, the officers' dispatch report explicitly satisfies that qualification.

Finally, Eurton alleges that Thomas and Covington violated Oldham County Police Department Standard Operating Procedures ("OCPD SOPs") regarding domestic-violence related home entries. Eurton specifically cites OCPD SOP 28.02, which provides that officers responding to domestic violence calls "may make a warrantless entry and search of a location when there is probable cause to believe that a victim may be in danger." RE 38-11, Domestic Violence SOPs, PageID 457. But Eurton's argument improperly attempts to establish a constitutional violation piecemeal, seemingly suggesting that every potential exigency had to independently justify the entry. The officers needed only a single exigency to enter the home—in this case, emergency aid. *See Case*, 146 S. Ct. at 505. Besides, police department policy violations do not independently

demonstrate constitutional violations. *Coitrone v. Murray*, 642 F. App'x 517, 522 (6th Cir. 2016) ("[T]he Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work." (alteration in original) (quoting *Cass v. City of Dayton*, 770 F.3d 368, 377 (6th Cir. 2014))).

Viewing the facts from a reasonable officer's perspective and drawing inferences in favor of Eurton, we affirm the district court's grant of qualified immunity on Eurton's warrantless entry claim at the first step of the analysis.

## B.     Excessive force

Eurton next claims that Thomas and Covington violated his constitutional rights when they drew a gun and a taser on him after forcing his door open. "A law enforcement officer uses force against another when he or she aims a firearm at an individual." *Brown v. City of Wyoming*, No. 23-1285, 2024 WL 5040781, at *6 (6th Cir. Dec. 9, 2024) (per curiam) (citing *Kent v. Oakland County*, 810 F.3d 384, 394 (6th Cir. 2016)). And "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts analyze uses of force "from the perspective of a reasonable officer on the scene," making "allowance[s] for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

*Graham* further counsels courts to assess "[1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This court

"review[s] the actions of each officer separately" because each "can be held liable only for his own wrongdoing," even where the officers acted together and arrived just minutes apart. *Reed*, 80 F.4th at 748 (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

### 1. Officer Thomas

Officer Thomas claims that he forced Eurton's front door open and raised his service firearm because he feared for both Eurton's safety and his own. Indeed, Thomas had information that Eurton was possibly armed, unstable, and likely to become violent, and saw Eurton's hand in his pocket as the door closed. Thomas's gun was pointed at Eurton for seventeen seconds total, just enough time to see that Eurton was not in immediate possession of a weapon.

Thomas's use of force was reasonable under *Graham*. The first *Graham* factor (severity of the crime) is inconclusive because there is no specific crime to guide the analysis. Eurton claims that the only relevant "crime" is "basic domestic violence," which he describes as a misdemeanor. CA6 R. 15, Appellant Br., at 40. That is incorrect; domestic violence can be a misdemeanor or felony in Kentucky. *See* Ky. Rev. Stat. § 403.720(2)(A). But here, without knowing more about any potential domestic violence against Whisman, it would have been impossible for Thomas to rely on any specific domestic violence offense.

The second *Graham* factor (theat to safety) "clearly favors" Thomas. RE 41, Mem. Op. & Order, PageID 540. Thomas and Covington do not dispute that they forced their way into Eurton's house and drew a gun and taser, respectively, on Eurton. But they persuasively argue that their show of force was reasonable under *Graham* because of the possibility of domestic violence against Whisman; because Eurton was "uncooperative" and ignoring commands; because they were aware that Eurton was intoxicated and possibly suicidal, likely had a weapon, and kept moving his hands to his pockets; and because they had credible information that he was likely to

become violent. CA6 R. 17, Appellee Br., at 43, 46-47. This evidence supports Thomas's reasonable fear that Eurton might quickly and unpredictably become violent toward the officers, Whisman, or himself. And the facts considered in a light favorable to Eurton do not erase the context of the encounter and Thomas's awareness about Eurton's intoxication, potential suicide attempt, and documented inclination to become violent; his family's warning that he was likely armed; and Whisman's response that she was not okay. In light of all the relevant circumstances, Thomas was justified in his belief that Eurton posed an "immediate threat" to merit qualified immunity on Eurton's excessive force claim.

The third and final *Graham* factor asks whether a plaintiff was "actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. This factor likely favors Eurton; although Eurton ignored the officers and retreated quickly and unexpectedly into his home, that cannot aptly be characterized as active resistance. *See Reed*, 80 F.4th at 749.

Based on the totality of the circumstances, we affirm the grant of qualified immunity to Thomas.

### 2. Officer Covington

The analysis of Covington's actions is largely identical to the analysis of Thomas's actions, if not even more favorable to Covington. Covington arrived at Eurton's home a few minutes after Thomas and in time to hear Thomas's entire interaction with Whisman. But his delayed arrival meant that he also missed Eurton telling Thomas that he had no plans to hurt himself. Covington, then, was aware of all the information relayed by 911 dispatch and saw that Whisman was distraught, but he had no indication that Eurton was safe. Covington watched as Eurton backed into the house while reaching into his pocket. Thomas, not Covington, forced the front door open,

and Covington pointed his taser at Eurton for about seventeen seconds. For the reasons set forth above, Covington should also receive qualified immunity on Eurton's excessive force claim.

Because Thomas and Covington's force against Eurton did not violate his constitutional rights, the officers are entitled to qualified immunity on this claim.

### C.    Improper seizure

After their initial entry, Thomas and Covington followed Eurton a short distance into his home for about twelve minutes, repeatedly asking him to talk to them and to show his hands, and assuring Eurton that he was not under arrest. Eurton appears to argue that the officers' investigative stop was unreasonable and ripened into an arrest for which they lacked probable cause. But Eurton fails to state a specific constitutional violation or explain how Thomas and Covington's alleged seizure violated clearly established law. That is problematic because "[t]he burden falls on the plaintiff to show that the defendant is not entitled to qualified immunity." *Mockeridge v. Harvey*, 149 F.4th 826, 833 (6th Cir. 2025) (citation modified).

We begin and end our analysis with the clearly established prong. A police officer's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation modified). "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The specific question at issue is whether it was clearly established, at the time of the incident between Eurton and the officers, that a 12-minute home entry to determine whether Eurton posed an immediate threat to himself or others was an unconstitutional seizure.

But Eurton does not point to any "existing precedent [that] placed th[is] . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Eurton first cites *Fisher v. Harden*, where we held that "[a]bsent suspected criminal activity, in this circuit a law enforcement official may not physically restrain an individual merely to assess his mental health." 398 F.3d 837, 842 (6th Cir. 2005). Instead, "an officer must have probable cause to believe that the person seized poses a danger to himself or others." *Id.* (citation modified). But in *Fisher*, officers responded to a suicide dispatch from a passerby's 911 call by laying Fisher face down on the road at gunpoint and handcuffing him even though he showed no outward signs of distress. *Id.* at 839-40. Here, by contrast, the officers had articulable reasons to believe that Eurton might be armed, violent, or imminently suicidal. And the officers did not restrain Eurton in any way but stood in the front hall of his house asking to speak with him out of concern for their safety, Whisman's, and Eurton's own.

Eurton's reliance on *Monday* is similarly unavailing. *Monday* held that no unlawful seizure occurred even when officers responded to a suicide prevention dispatch, pepper-sprayed the plaintiff when he refused to accompany them to the hospital for a mental health assessment, and took him to the hospital in a stretcher, where he had to stay for five days because of his severe reaction to the spray. 118 F.3d at 1101-02. Thomas and Covington's attempts to speak with Eurton are a far cry from the aggressive events of *Monday*, and do not constitute a seizure "specifically for purposes of a professional psychiatric evaluation," as we have later read *Monday*. *Fisher*, 398 F.3d at 846 (citing *Monday*, 118 F.3d at 1102).

Because Eurton cannot show that a reasonable officer in Thomas and Covington's position would have believed a twelve-minute home entry to assess Eurton's wellness violated his constitutional rights, qualified immunity is appropriate.

### III.    Eurton's state claims

Next, Eurton argues that the district court incorrectly granted summary judgment to the officers on his state tort claims.  In Kentucky, police officers are entitled to "qualified immunity from tort liability . . . for '(1) discretionary acts or functions . . .; (2) in good faith; and (3) within the scope of the employee's authority.'"  *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (second alteration in original) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)).

### A.    Discretionary duties

Eurton first contends that Thomas and Covington were performing ministerial, not discretionary, duties during their encounter with Eurton, making qualified immunity inapplicable under *Yanero*.  Eurton notes that this court "has observed that police department SOPs can be a source of ministerial duties when they set clear constraints on an officer's discretion."  CA6 R. 15, Appellant Br., at 44 (citing *Browning v. Edmonson County*, 18 F.4th 516, 533 (6th Cir. 2021)).  But *Browning* defines a ministerial act as one which "requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  18 F.4th at 531-32 (quoting *Yanero*, 65 S.W.3d at 522).  By contrast, a discretionary act is "the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Id.* at 532 (quoting *Yanero*, 65 S.W.3d at 522).

Eurton unpersuasively argues that the SOP guidelines covering warrantless home entry for domestic violence situations (28.02) and use of physical force (21.00) render those duties entirely ministerial in nature.  CA6 R. 15, Appellant Br., at 44-45.  But Eurton's two discrete SOPs do not control because they do not bear upon the totality of the circumstances facing the officers.  And under *Browning*, Thomas and Covington were clearly performing discretionary actions, which required them to assess the circumstances at Eurton's residence and make quick decisions about

their own safety, Eurton's, and Whisman's. *See Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003). The officers' encounter cannot reasonably be described as "involving merely execution of a specific act arising from fixed and designated facts." *Browning*, 18 F.4th at 536 (quoting *Yanero*, 65 S.W.3d at 522).

## B.      Bad faith

Next, Eurton argues that even if Thomas and Eurton acted within their discretion, their "subjective good faith is a disputable question of fact." CA6 R. 15, Appellant Br., at 46. Bad faith can be predicated on a violation of a clearly established right which an officer "presumptively would have known was afforded to a person in the plaintiff's position." *Yanero*, 65 S.W.3d at 523. Evidence that an officer's action "willfully or maliciously intended to harm the plaintiff" also supports a finding of bad faith. *Id.* As discussed above, Thomas and Covington did not violate Eurton's clearly established constitutional rights. Moreover, Eurton provides no evidence of Thomas and Covington's subjective bad faith that would allow us to find that the officers acted with an intent to harm him.

For these reasons, the district court properly granted summary judgment to the officers on Eurton's state law claims.

## III.    Claims against Oldham County

Finally, Eurton attempts to resurrect his § 1983 claims against Oldham County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Eurton argues that the municipality acquiesced in Thomas and Covington's alleged unconstitutional conduct and that "inadequate supervision and training exists as a *de facto* policy" within the Oldham County police department. CA6 R. 15, Appellant Br., at 48. But where "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."

*Westmoreland v. Butler County*, 29 F.4th 721, 731 (6th Cir. 2022) (citation omitted). Because Thomas and Covington did not violate Eurton's clearly established constitutional rights, his *Monell* claim must fail.

## CONCLUSION

For these reasons, we affirm the district court's grant of summary judgment on Eurton's constitutional and state law claims and its dismissal of Eurton's *Monell* claims.