RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ROBERT SEAN REED,

　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

CAMPBELL COUNTY, KENTUCKY,

　　　　　　　　　　*Defendant*,

MICHAEL RAY CURTIS; KYLE G. GRAY,

　　　　　　　　　　*Defendants-Appellants*.

No. 22-5751

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00158—William O. Bertelsman, District Judge.

Argued: July 27, 2023

Decided and Filed: August 30, 2023

Before: MOORE, ROGERS, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellants. Michael Jay O'Hara, O'HARA, TAYLOR, SLOAN, CASSIDY, BECK PLLC, Covington, Kentucky, for Appellee. **ON BRIEF:** Jeffrey C. Mando, Jennifer L. Langen, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellants. Michael Jay O'Hara, Colby B. Cowherd, O'HARA, TAYLOR, SLOAN, CASSIDY, BECK PLLC, Covington, Kentucky, for Appellee.

　　　MOORE, J., delivered the opinion of the court in which GRIFFIN, J., joined, and ROGERS, J., joined in part. ROGERS, J. (pp. 20–23), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Police officers Michael Curtis and Kyle Gray responded to a 911 call reporting a domestic dispute.  When they arrived at the reported location, all was quiet, and they could not detect any signs of an altercation.  The officers knocked on Robert Reed's front door.  After a brief verbal exchange, Reed refused to engage further with the officers because they did not have a warrant.  The officers then broke down Reed's front door, pointed a gun at his head, and removed him from his home.  Reed filed a suit against the officers in their official and individual capacities under 42 U.S.C. § 1983.  Upon motions for summary judgment, the district court denied the officers qualified immunity for Reed's Fourth Amendment claims of unlawful entry, false arrest, and excessive force. We **AFFIRM** the district court's denial of qualified immunity.

## I. BACKGROUND

Shortly before 9:00 p.m. on April 11, 2020, the Campbell County dispatch center received a 911 call.  R. 1 (Compl. ¶ 10) (Page ID #3); R. 60-1 (911 Call Tr. at 2–5) (Page ID #1000–03).  The caller reported that "the people that live behind me, I don't know if they're having a domestic dispute or what" and that while in her backyard she "just heard him yelling and what sounds like him hitting something. . . .  I don't know if he's hitting dogs or if he's hitting humans."  *Id.* at 2:3–5, 3:9–12 (Page ID #1000, 1001).  She gave the dispatcher the address as 7 South Cottonwood.  *Id.* at 2:8–9 (Page ID #1000).  She identified herself by her first name.  *Id.* at 3:4 (Page ID #1001).  The dispatcher then communicated to police: "7 South Cottonwood for a domestic.  Caller's advising it sounds like they're outside (inaudible) verbal and physical."  *Id.* at 3:20–23 (Page ID #1001).  Officers Michael Curtis and Kyle Gray responded to the call at 7 South Cottonwood.  *See* R. 31 (Curtis Dep. Tr. at 68:9–12) (Page ID #166).  They wore body cameras, which were engaged and recording throughout the incident. R. 39-3 (Gray Cam. at 0:30–0:50); R. 39-4 (Curtis Cam. at 0:42–0:57).

When Officers Curtis and Gray arrived at 7 South Cottonwood, they did not see or hear anything amiss. R. 39-3 (Gray Cam. at 0:30–0:50); R. 39-4 (Curtis Cam. at 0:42–0:57); R. 31 (Curtis Dep. Tr. at 68:4–8, 69:3–24; 70:19–71:17) (Page ID #166, 167–69); R. 32 (Gray Dep. Tr. at 89:8–13, 92:10–11) (Page ID #307, 310). Officer Curtis walked around the right side of the house and told Officer Gray "I don't see anything or hear anything," before returning to the front of the house. R. 39-3 (Gray Cam. at 0:57–1:21); R. 31 (Curtis Dep. Tr. at 70:6–9) (Page ID #168). Officer Gray went onto the front porch and looked through a window, through which he could see that there was a light on in the house, though he could not see anyone from his vantage point. R. 39-4 (Curtis Cam. at 1:07). He said to Curtis "I can't tell if somebody is on the back porch or not." *Id.* at 1:15–17; R. 32 (Gray Dep. Tr. at 98:15–22) (Page ID #316). The officers then walked around the left side of the house. R. 39-3 (Gray Cam. at 1:18–28); R. 39-4 (Curtis Cam. at 1:28–38). Gray asked, "I thought they said they were outside, no?" and Curtis responded, "That's what they said." R. 39-3 (Gray Cam. at 1:20–21); R. 39-4 (Curtis Cam. at 1:33). The officers saw nothing out of the ordinary in the left side of the yard. R. 39-3 (Gray Cam. at 1:31–58); R. 39-4 (Curtis Cam. at 1:44–2:14).

The officers then returned to the front door. Gray opened the screen door and knocked. Curtis was positioned to the right of the front door and could see through the front window. R. 39-4 (Curtis Cam. at 2:30–2:45). Curtis told Gray that he saw "a guy coming to the door" and "a female in the back bedroom." R. 39-4 (Curtis Cam. at 2:37–2:52). Curtis later testified at his deposition that the woman "seemed kind of standoffish, kind of timid," which he had seen before in domestic violence victims, but he did not express that to Gray at the time. R. 31 (Curtis Dep. Tr. at 83:12–21) (Page ID #181); R. 39-4 (Curtis Cam. at 2:29–2:55). Curtis also conceded in his deposition that the woman was "kind of just standing there in the background," she was not crying, and he could not observe any injuries on her. R. 31 (Curtis Dep. Tr. at 84:8–23) (Page ID #182).

Robert Reed then answered the door. R. 39-3 (Gray Cam. at 2:40–2:45). Gray asked Reed, "Do you mind stepping out here and talking to me for a second, sir?" *Id.* Reed asked "Uh, you got a warrant?" *Id.* at 2:45–2:47. Gray replied, "nope." *Id.* Reed then asked, "What is this about?" *Id.* at 2:47–2:50. Gray then explained that "somebody called and said that somebody

was fighting and arguing over here." *Id.* at 2:50–2:53. Reed said, "Wasn't here. Sorry, Officer." *Id.* at 2:54–2:56. Gray then asked if anyone else was inside the house. *Id.* at 2:56–2:58. Reed said, "Yes, but do you got a warrant?" and added that the officers "don't have probable cause." *Id.* at 2:58–3:04. Gray responded that they did have probable cause and that the officers had been "nothing but nice and respectful." *Id.* at 3:05–3:09. Reed replied, "I know, but I just don't want to deal with any officers in my house. I don't know who called; I don't really care." *Id.* at 3:07–3:14. Gray then said, "if there's any other adults in the house, I need to talk to them," and warned that "if not, then we can come in, because it's called exigent circumstances." *Id.* at 3:25–3:30. Reed then responded, "if you don't have a warrant, goodbye," and closed his front door. *Id.* at 3:33–3:37. Throughout the entire conversation, Reed had remained in the confines of his home. *Id.* at 2:40–3:40.

As Reed closed the door, Gray warned him, "don't do that." *Id.* at 3:33–3:37. Officer Curtis immediately joined Gray at the front door and kicked the door down. R. 39-4 (Curtis Cam. at 3:50–3:54). Curtis shouted "open the goddamn door!" and stepped into the home, drew his firearm, and pointed it at Reed's head. *Id.* at 3:53–3:58. Curtis then put the gun away, grabbed Reed by the arm, and pulled Reed onto the porch. *Id.* at 3:58–4:01; R. 39-3 (Gray Cam. at 3:43–47). Gray then grabbed Reed's arm, led him to the driveway, and pushed him on the chest to back him up against the car. R. 39-3 (Gray Cam. at 3:48–3:55). Gray instructed Reed to turn around, and Reed repeatedly refused and asked if the officers had a warrant. *Id.* at 3:57–4:20. Gray then grabbed Reed's right shoulder, physically turned him around, and patted him down. *Id.* at 4:17–5:19. Other officers arrived and spoke with members of Reed's family, who had emerged from the home. *Id.* at 5:19–16:00. Once the officers were satisfied that everyone in Reed's house was safe, they documented the damage to Reed's door and left the scene. R. 39-3 (Gray Cam. at 12:30–13:02, 16:03–16:49). There were no arrests made or citations issued in connection with the incident. R. 34 (Reed Dep. Tr. at 101:2–5) (Page ID #694).

Reed filed a complaint against Officers Gray and Curtis in their individual and official capacities and against Campbell County. R. 1 (Compl. at 1, ¶¶ 6–8) (Page ID #1, 2). He raised nine claims: excessive force, unlawful entry, false arrest, unlawful *Terry* stop, a *Monell* claim for failure to train, assault and battery, common law false arrest/imprisonment, intentional

infliction of emotional distress, and punitive damages. *Id.* ¶¶ 35–84 (Page ID #6–11). The defendants moved for summary judgment, and Reed moved for summary judgment for all of his claims except for his *Monell* claim and his claims for intentional infliction of emotional distress and punitive damages. R. 39 (Defs.' Mot. for Summ. J. at 1–21) (Page ID #803–823); R. 41 (Pl.'s Mot. for Summ. J. at 1) (Page ID #834).

The district court dismissed the claims against Campbell County, R. 61 (Mem. Op. & Order at 25–28) (Page ID #1029–1032), and against the officers in their official capacities, *id.* at 8 n.2., 29 n.9, 32 n.12 (Page ID #1012, 1033, 1036). It dismissed the *Terry* claim as "duplicative" of the false arrest claim. *Id.* at 21 (Page ID #1025). It dismissed Reed's claims for intentional infliction of emotional distress and punitive damages. *Id.* at 30, 32 (Page ID #1034, 1036). And as is relevant to this appeal, it declined to award qualified immunity to Officers Gray and Curtis on the individual capacity unlawful-entry, excessive-force, and false-arrest claims as well as the state-law assault and battery and false-arrest claims. *Id.* at 18, 21, 25, 29–31 (Page ID #1022, 1025, 1029, 1034–35). The officers timely filed a notice of appeal. R. 62 (Notice of Appeal at 1) (Page ID #1037).

## II.  JURISDICTION AND STANDARD OF REVIEW

Though a denial of summary judgment is not ordinarily a reviewable order because it is not a final judgment, "the 'denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.'" *Browning v. Edmonson County*, 18 F.4th 516, 523 (6th Cir. 2021) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). In such an interlocutory appeal, "this court may review only 'purely' legal arguments." *Est. of Bing v. Whitehall*, 456 F.3d 555, 563 (6th Cir. 2006) (quoting *Smith v. Cupp*, 430 F.3d 766, 772 (6th Cir. 2005)). The defendants here have agreed to "take the undisputed material facts in a light most favorable to Reed and appeal only the District Court's legal conclusion denying them qualified immunity." Appellants Br. at 1. We therefore have jurisdiction over this appeal, and we review de novo the district court's legal conclusions. *McCullum v. Tepe*, 693 F.3d 696, 699 (6th Cir. 2012).

## III.  ANALYSIS

### A.  Qualified Immunity Standard

The defendants argue that the district court "failed to acknowledge and adhere to the standard for qualified immunity."  Appellants Br. at 16.  Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To overcome the qualified-immunity defense, a plaintiff must show that the official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  A right is clearly established when "every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original).  The district court did not err in setting out the qualified-immunity standard in its opinion.  R. 61 (Mem. Op. & Order at 8) (Page ID #1012). We apply the standard to each of Reed's claims below.

### B.  Unlawful Entry

#### 1.  Constitutional Violation Inquiry

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.  At its core, the Fourth Amendment protects the right of an individual to "retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 590 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  It is therefore "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)); *see also Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (same).

The Fourth Amendment, however, "does not prohibit all unwelcome intrusions 'on private property'—only 'unreasonable' ones." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).  Thus, there are some exceptions to the warrant requirement for searches or seizures within a home, including an exception for "exigent circumstances." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021).  This "well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021) (alteration in original) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).  "[T]he need to assist persons who are seriously injured or threatened with such injury" is one such exigent circumstance.  *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  The Court has held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Brigham City*, 547 U.S. at 403.  Though "'[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception,' . . . they must have an objectively reasonable basis for believing that 'a person within the house is in need of immediate aid.'"  *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015) (quoting *Fisher*, 558 U.S. at 47, 49).  And "their decision to enter must be based on more than a hunch or 'the mere possibility' that someone inside needs immediate aid."  *Id.* (quoting *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013)).  "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant," we must "look[] to the totality of circumstances."  *Missouri v. McNeely*, 569 U.S. 141, 149 (2013).  If a reasonable jury could conclude that there were no exigent circumstances, then there was a constitutional violation.  *See Barton v. Martin*, 949 F.3d 938, 949 (6th Cir. 2020).

The parties agree that the defendants made a warrantless entry into Reed's home.  We must assess whether a reasonable jury could believe that exigent circumstances existed that would have excused the lack of a warrant, and therefore we must consider whether the officers had an "objectively reasonable basis for believing that 'a person within the house is in need of immediate aid.'"  *Gradisher*, 794 F.3d at 584 (quoting *Fisher*, 558 U.S. at 49).  We hold that, taking Reed's version of the facts, a reasonable jury could find that the officers did not have an

objectively reasonable basis for believing that someone in Reed's home was being (or in danger of being) harmed.

The officers proffered the following factors as indicative of exigent circumstances: the 911 caller reported a potential verbal and physical altercation outside of Reed's house, Curtis saw a woman in the house who looked "timid," Reed "refused to give others in the house the option of coming to the door so Curtis and Gray could ask about their welfare," Curtis was concerned that Reed would retaliate against the woman he saw in the house if he believed she made the 911 call, and Curtis feared that Reed was arming himself.[1]  Appellants Br. at 20.  We must also consider other factors:  everything was quiet on the scene when the officers arrived, there was no sign of a dispute either inside or outside of the house, and the officers saw no one who appeared to be injured or upset.

The 911 call alone is insufficient to justify the officers' warrantless entry.  The 911 call report was vague regarding sounds of yelling and hitting of dogs or humans.  The officers needed more than just that phone call to make a warrantless entry into a home.  But when they investigated, they did not find more.  When they arrived at the scene, they heard nothing and saw nothing amiss.  R. 39-3 (Gray Cam. at 0:57–1:21); R. 39-4 (Curtis Cam. at 1:20–1:23); R. 31 (Curtis Dep. Tr. at 69:3–24) (Page ID #167); R. 32 (Gray Dep. Tr. at 89:2–13; 91:4–92:11) (Page ID #307, 309–10).  The circumstances at the scene therefore contradicted the 911 caller's report of the verbal and physical altercation outside.  *Cf. Williams*, 9 F.4th at 435–36 (no exigent circumstances when police responded to a report of a domestic disturbance and found no signs of a disturbance or forcible entry); *United States v. McClain*, 444 F.3d 556, 563–64 (6th Cir. 2005) (no exigent circumstances when there were no physical signs of a crime to justify a warrantless entry into a home in response to a neighbor's 911 call reporting a burglary).

The officers point to Marsha Reed's presence in the home and to Reed's refusal to let them speak to others inside the home as indications that there were exigent circumstances.  The officers' inability to see potential victims inside the home may contribute to exigency.  *Baker v.*

---

[1]The officers also contend that Reed was hostile, but we must take the facts in the light most favorable to the party opposing summary judgment.  A reasonable juror could view the body camera footage and conclude that Reed was not hostile, but respectful while asserting his Fourth Amendment rights.

*City of Trenton*, 936 F.3d 523, 532 (6th Cir. 2019); *Schreiber v. Moe*, 596 F.3d 323, 330–31 (6th Cir. 2010). But this case is significantly different from those the defendants point to. In *Schreiber*, a 911 caller reported a domestic dispute between a daughter and her father. 596 F.3d at 330. The caller heard screaming while on the phone with the daughter and feared she was being beaten. *Id.* When the officer reached the scene, he heard a male voice shouting inside the home, verifying the 911 caller's observation that there had been shouting and suggesting that there was an altercation of some kind occurring inside the home. *Id.* When the officer knocked on the door and asked about the girl's welfare, the father told the officer to leave and "bombarded him with a slew of profanities." *Id.* These observations corroborated the 911 caller's report and, combined with the fact that the officer could not see the child to verify her safety, constituted an "objectively reasonable basis for believing" that the child was in danger of an imminent injury. *Id.* at 331. In *Baker*, an individual called 911 to report that a friend of his had pulled a knife on him and took his cell phone. He reported that the friend was also yelling at his mother and threatening her with a knife or possibly a shotgun in their home. 936 F.3d at 532. Calls to the friend's home were met with busy signals. *Id.* In each of these cases, the 911 caller made a significantly more detailed report and there were other indications that there was an altercation occurring and an individual within the home that was in immediate need of help—an individual that the officers could not see.[2] In this case, the officers arrived at the scene to find no evidence corroborating the 911 call, and even though the officers were not able to speak with Marsha Reed, they were able to see her through the front window. R. 31 (Curtis Dep. Tr. at 84:8–23) (Page ID #182). Curtis testified that she was not injured or crying, as far as he could tell. *Id.*

---

[2]In *Fineout v. Kostanko*, 780 F. App'x 317, 326 (6th Cir. 2019), which the defendants also cite, there were other circumstances at play besides the refusal to let the officers see the children who were potentially being abused; the officers had been given the (erroneous) information that the home was "red-tagged" by the city and therefore legally uninhabitable, and before the entry the officers discovered that there was an active arrest warrant for one of the occupants. *Id.* at 326–27. The 911 call in that case also provided a much more detailed account of the dispute: the caller reported that "adults in the home were 'scream[ing] profanities and . . . hitting their children" and that a "'little girl . . . between the ages of 1 and 2' lived in the house." *Id.* at 326. The court in *Fineout* also resolved the plaintiff's Fourth Amendment claim on the clearly established prong and did not hold that the facts stated above amounted to exigent circumstances. *Id.* at 326.

Officers may not need to see "outward manifestations of violence" to find that there are exigent circumstances, *Schreiber*, 596 F.3d at 331, but they do need *something* beyond the present 911 call—whether or not the phone call is anonymous, *see Williams*, 9 F.4th at 435–36; *McClain*, 444 F.3d at 563–64; *Thacker v. City of Columbus*, 328 F.3d 244, 254 n.2 (6th Cir. 2003). The presence of a woman inside a home who appeared "timid" to a police officer, without more, does not constitute exigent circumstances. The officer's perception of timidity by the woman is purely subjective and, most importantly, conveys no emergency or imminent risk or harm which could justify not applying for a search warrant. One of the officers could have remained at the scene while the other applied for a warrant.

The officers contend that they were worried Reed was arming himself or could have retaliated against Mrs. Reed for calling the police. Appellants Br. at 20. A reasonable jury could conclude, however, that this was pure speculation on an unreasonable "hunch." *Gradisher*, 794 F.3d at 584. The scene was calm, Reed denied that a domestic dispute had occurred, and the officers did not see Mrs. Reed injured or in distress. "[G]eneric possibilities of danger cannot overcome the required particularized showing of a risk of immediate harm." *Morgan v. Fairfield County*, 903 F.3d 553, 562 (6th Cir. 2018).

In light of the lack of evidence corroborating the 911 report, a jury could conclude that the officers did not have a reasonable basis for believing that there was someone inside of Reed's home who needed immediate aid. Thus the officers violated Reed's constitutional rights by entering his home without a warrant.

## 2. Clearly Established Inquiry

To satisfy the second prong of the qualified-immunity analysis, the officers' unconstitutional conduct must violate clearly established law. *Williams*, 9 F.4th at 437. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (alterations in original). Though there need not be

"a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

We have repeatedly held that "it [i]s clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Barton*, 949 F.3d at 949; *Williams*, 9 F.4th at 437–38; *Coffey v. Carroll*, 933 F.3d 577, 587 (6th Cir. 2019) (affirming a district court's denial of qualified immunity when "the district court defined the right at issue as the Fourth Amendment right against an officer entering a person's home without a warrant"); *Goodwin v. City of Painesville*, 781 F.3d 314, 332 (6th Cir. 2015) ("[W]arrantless entries based on the emergency aid exception require both the potential for injury to the officers or others and the need for swift action. The right to be free from warrantless search under this exception absent these factors is clearly established."); *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) ("[B]edrock Fourth Amendment principles . . . demonstrate that the officers' forced warrantless entry into [the plaintiff's] home was presumptively unreasonable, and the Court's exigency decisions . . . clearly show that [the defendants] had no objectively reasonable basis for believing that their warrantless entry" was justified by an exigency exception).

As in *Williams*, "a reasonable jury could find that Defendants' warrantless entry into Plaintiff['s] home violated the Fourth Amendment's prohibition against unreasonable searches." 9 F.4th at 438. And if the jury finds that there was no exigent circumstance, then, as in *Barton*, Defendants' warrantless entry into Plaintiff's home "violated clearly established law." 949 F.3d at 949; *see also Williams*, 9 F.4th at 438; *Goodwin*, 781 F.3d at 332. Foundational principles of the Fourth Amendment establish that forced warrantless entry into an individual's home is presumptively unreasonable, and when an officer has no objectively reasonable basis for believing that the warrantless entry was supported by exigent circumstances, the officer is not entitled to qualified immunity. *See Barton*, 949 F.3d at 950.

## C. False Arrest

### 1. Constitutional Violation

The officers also appeal the district court's denial of qualified immunity on Reed's false arrest claim. The Fourth Amendment prohibits "unreasonable" "seizures." U.S. Const. amend. IV. Officers need "probable cause to believe that a criminal offense has been or is being committed" to support a warrantless arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), or "a particularized and objective basis for suspecting [a] particular person of criminal activity" to support an investigatory stop, *U.S. v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)). And "warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention." *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001).

Both sides agree that the officers seized Reed without a warrant when they broke down his door, took him from his home at gunpoint, escorted him onto his driveway, and held him there for about twelve minutes. Reed argues that even if it was a detention and not an arrest, the officers lacked reasonable suspicion to detain him. Appellee Br. at 42.

The officers contend that this was a temporary investigatory detention, and that Gray and Curtis had "reason to suspect that Reed was intentionally obstructing them from performing their official duties" in violation of Kentucky Revised Statute § 525.015. Appellants Br. at 28. They then suggest that they had reasonable suspicion to believe that Reed had assaulted or was about to assault someone in the home, in violation of Kentucky Revised Statute § 508.030. *Id.* at 29. Even assuming the officers *did* have reasonable suspicion to believe that Reed was committing either of these offenses, they are misdemeanors. Ky. Rev. Stat. § 525.015(3) ("Obstructing an emergency responder is a violation for a first offense, and a Class B misdemeanor for a second or subsequent offense"); Ky. Rev. Stat. § 508.030(2) ("Assault in the fourth degree is a Class A misdemeanor."). The Supreme Court has long held that there is a presumption against warrantless entries to investigate minor crimes or to arrest individuals for committing them. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

In order for the arrest or investigatory detention to have been permissible, then, there had to have been exigent circumstances excusing the lack of a warrant. But as delineated above, a reasonable jury could conclude that there was no objectively reasonable basis for believing that the officers' warrantless entry was justified by exigent circumstances, and therefore the detention was a constitutional violation.[3]

## 2. Clearly Established

It is clearly established that an arrest warrant is required to seize an individual in their home, even if an officer has probable cause. *See Payton*, 445 U.S. at 602–03. And as of 2020, both *Payton* and *Welsh* had been the law for more than thirty-five years, "making it clear that a double presumption guarded against warrantless entries into a home to arrest a misdemeanor suspect." *Smith v. Stoneburner*, 716 F.3d 926, 933 (6th Cir. 2013). The offenses that the officers contend that they reasonably believed Reed had violated are both misdemeanors;[4] it has been reaffirmed by this court as recently as 2013 that warrantless arrests of a misdemeanor suspect inside the home are impermissible. *Id.* at 933. Without exigent circumstances, the arrest was presumptively unreasonable. And as above, without an objectively reasonable basis for concluding that someone inside the home needed emergency aid, it is clearly established that the officers could not enter to arrest Reed.[5]

---

[3]The district court refers to our previous statements that there is a "general right to detain without reasonable suspicion or probable cause" when "the officers making the seizures acted out of a justifiable fear of personal safety." R. 61 (Mem. Op. & Order at 19–20) (Page ID #1023–24) (quoting *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999)). But this "general right to detain" is applicable only when "necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011). Because we have concluded that a reasonable jury could determine that there were no exigent circumstances justifying the officers' warrantless entry into Reed's home, it follows that there would be no "valid search or arrest" pursuant to which the officers could detain Reed.

[4]The officers also cite Kentucky Revised Statute § 508.032, which makes a third or subsequent offense of assault in the fourth degree against a family member or member of an unmarried couple a class D felony. Ky. Rev. Stat. § 508.032(1). But the officers offered no evidence to suggest that they had any reason to believe that Reed had been convicted of at least two other assaults against a family member or member of an unmarried couple in the previous five years, which are the preconditions for § 508.032 to apply rather than § 508.030.

[5]Even if Reed had not been inside his home, his arrest would likely have been invalid. We held in 2020 that, as of 2014, "it was clearly established that a non-eyewitness neighbor's call reporting criminal activity without further corroborating information does not provide probable cause for an arrest." *Barton*, 949 F.3d at 952.

**D. Use of Force**

**1. Constitutional Violation**

We analyze claims that an officer used excessive force when arresting a person "under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). We must "ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Coffey*, 933 F.3d at 588 (quoting *Graham*, 490 U.S. at 397). Factors relevant to this inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Each officer can be held liable only for his own wrongdoing, and so we review the actions of each officer separately. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). We also review separately each use of force by the same officer. *See Barton*, 949 F.3d at 952–55.

**a. Curtis**

A reasonable jury could conclude that Curtis used excessive force when he pointed a gun at Reed's head, grabbed Reed by the arm, and pulled him out of his home and onto the porch. The severity of the crime at issue was minimal. The officers contended that they reasonably suspected Reed was obstructing their investigation in violation of Kentucky Revised Statute § 525.015, which makes obstruction of a public official a violation for a first offense or a misdemeanor for a second offense. There are good reasons to conclude that, even if this offense could have justified the officers' seizure, Reed did not violate the statute. "When law enforcement officers who are not armed with a warrant knock on a door . . . the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *King*, 563 U.S. at 469–70. If the state could criminalize refusing entry to one's home to police officers, it would eviscerate the core protections of the Fourth Amendment; the exercise of "Fourth Amendment rights can hardly be grounds for police to circumvent the core right protected by the Amendment." *Williams*, 9 F.4th

at 434.  In addition, because the officers' investigation failed to corroborate the 911 caller's report, Curtis had little reason to believe that Reed had committed an assault in violation of Kentucky Revised Statute § 508.030.  *See Williams*, 9 F.4th at 439 (reasoning that because "the information known to [the police officers] did not support a conclusion that there was a 'real exigency' within [the] home that required a warrantless entry," the use of force was not reasonable to ensure the safety of the occupants of the home).

Curtis also had no reasonable basis to believe that Reed posed a threat to safety.  Reed denied that a dispute had occurred, declined to interact further with the police because they did not have a warrant, and remained within the safety of his home.  *Cf. Shumate v. City of Adrian*, 44 F.4th 427, 444 (6th Cir. 2022) ("[The plaintiff] may have been minimally threatening insofar as his behavior was rude, annoying, untoward, and uncooperative.  However, mere 'agitated hand gestures' and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." (quoting *Kent v. Oakland County*, 810 F.3d 384, 391 (6th Cir. 2016)).  The officers contend that they feared Reed would obtain a weapon.  But "[w]e do not credit an officer's subjective fear that an individual has a weapon where objective indicia are absent."  *Id.*; *see also Browning*, 18 F.4th at 528 ("[T]he remote risk that [the suspect] could have been armed does not establish that he posed a reasonable threat of danger.").

Finally, Reed did not resist being detained.  The officers frame Reed's behavior as "openly hostile" because "[t]he first words out of his mouth in response to a simple greeting were, 'You got a warrant?'"  Appellants Br. at 31.  The question of Reed's hostility is a question for the jury; a reasonable jury could watch the body camera footage and conclude that Reed was not hostile.  True, Reed did not facilitate the officers' request to speak with others in the house and attempted to end the encounter.  But withdrawal into the home does not constitute resistance.  In *Goodwin v. City of Painesville*, we concluded that an individual who refused to comply with an order to leave his home was engaging only in "passive resistance that was not sufficient to legitimize the officer's use of force."  781 F.3d at 323–24.  We determined that "[a] holding that a simple refusal to exit one's own home—and surrender the heightened Fourth Amendment protections it provides—constituted active resistance of an officer's command sufficient to

justify a tasering would undermine a central purpose of the Fourth Amendment." *Id.* at 327. Likewise, we conclude that refusing to permit police officers to enter one's home or refusing to continue an interview with an officer outside of one's home also cannot constitute "active resistance" sufficient to justify a use of force. "[A]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton*, 445 U.S. at 589–90 (quoting *Silverman*, 365 U.S. at 511 (second alteration in original)). It would undermine the foundational principles of the Fourth Amendment to say that retreating into one's home constitutes active resistance justifying the use of force. Reed's retreat into his home was passive resistance at worst and is better characterized as no resistance at all. And the body camera footage shows that Reed did not physically resist when Curtis pulled him from his home. R. 39-3 (Gray Cam. at 3:42–3:49).

The totality of the circumstances did not justify Curtis's actions. Curtis pointed his service weapon at Reed's head, which is a considerable use of force. *See Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) ("[P]ointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply with the [] demands, the [one pointing the firearm] will shoot the individual." (quoting *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007) (alterations in original)). A reasonable jury could find that Curtis did so after entering Reed's home without exigent circumstances and without any basis to think that Reed committed a serious crime or posed a threat to Curtis's or others' safety. *See Wright v. City of Euclid*, 962 F.3d 852, 870 (6th Cir. 2020) ("[B]randishing a firearm without a justifiable fear that [the plaintiff] was fleeing or dangerous was unreasonable and constituted excessive force.").

A jury could also conclude that Curtis's subsequent actions—grabbing Reed by the arm and pulling him out of his home—were also unreasonable under the totality of the circumstances. "[E]ven minor uses of force are unconstitutionally excessive if they are 'totally gratuitous.'" *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). Because the jury could conclude that the officers "had no right to be inside [Reed's] home" to detain him in the first place, it

would follow that Curtis "had no right to use force" because such force would necessarily be gratuitous. *Williams*, 9 F.4th at 440.

Curtis argues that the "type and degree" of force he used was similar in kind to that used by the defendant officer in *Neal v. Melton*, 453 F. App'x 572 (6th Cir. 2011), in which we held that there was no unreasonable force when an officer took a non-resisting plaintiff's arm and escorted him away from a car. Appellants Br. at 32; *Neal*, 534 F. App'x at 576–77. But that case dealt with a traffic stop, not a warrantless entry into a home, and it also did not involve pointing a lethal weapon at the plaintiff's head. A reasonable jury could conclude that Curtis's uses of force were gratuitous.

### b. Gray

Gray likewise used excessive force against Reed when he grabbed Reed by the arm and led him to the driveway, pushed him on the chest towards a car, and placed his hand on Reed's shoulder to turn him around. The analysis of the first two *Graham* factors are the same; the severity of the alleged crime Reed was suspected of is minimal and the threat to safety remained nonexistent.

As far as whether Reed was actively resisting his detainment, a reasonable jury could conclude that he was not. Gray repeatedly ordered Reed to turn around when they were standing in Reed's driveway, and Reed repeatedly asked, "Do you have a warrant?" instead of complying. R. 39-3 (Gray Cam. at 3:55–4:22). But "if there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more." *Goodwin*, 781 F.3d at 326 (brackets omitted) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)); *see also Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1154–55 (6th Cir. 2022); *Kent*, 810 F.3d at 393–95 (determining that an individual who yelled at officers but did not make threats of harm was not engaging in active resistance, and weighing the fact that the individual was in his home, "one of the most sacred of spaces under the Fourth Amendment's protections," *id.* at 394).

Though "[n]ot every push or shove . . . violates the Fourth Amendment," *Graham*, 490 U.S. at 396, we have never imposed a *de minimis* injury requirement for Fourth Amendment

excessive-force claims. *Williams*, 9 F.4th at 439–40; *Morrison v. Bd. of Trs.*, 583 F.3d 394, 406–07 (6th Cir. 2009) (collecting cases). Any force used to accomplish an unlawful detention could be deemed unreasonable under the Fourth Amendment. *Williams*, 9 F.4th at 440 ("If Defendants forcibly entered Mitchell's home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable 'gratuitous violence.'"). As a result, a reasonable jury could conclude that Gray used excessive force when he grabbed Reed, pushed him, and turned him by the shoulder.

**2. Clearly Established**

**a. Curtis**

It is clearly established law that officers may not use gratuitous violence against individuals who are not actively resisting. *E.g.*, *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006); *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam); *Barton*, 949 F.3d at 954; *Shumate*, 44 F.4th at 450 ("By 2019 . . . the right to be free from physical force when one is not actively resisting the police was clearly established." (citing cases from 2007, 2010)). We have determined that "[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983." *Coffey*, 933 F.3d at 589; *see also Meadows v. City of Walker*, 46 F.4th 416, 422–23 (6th Cir. 2022) (same).

Even though we can simply draw the line at active resistance, we have in the past held that "it [is] clearly established . . . that brandishing a firearm without a justifiable fear that [an individual] was fleeing or dangerous was unreasonable and constituted excessive force." *Wright*, 962 F.3d at 870. We determined that this was clearly established at least as of 2016. *Id.* at 860, 870. Curtis was therefore on notice that it is unreasonable and constitutes excessive force to point a firearm at Reed without a justifiable fear that Reed was dangerous or fleeing.

**b. Gray**

As stated above with regard to Curtis, it is clearly established law that officers may not use gratuitous violence against individuals who are not actively resisting. *E.g.*, *Shreve*, 453 F.3d

at 688; *Smith*, 874 F.3d at 945; *Coffey*, 933 F.3d at 589; *Barton*, 949 F.3d at 954; *Shumate*, 44 F.4th at 450.  Because Reed was not engaging in active resistance and because Gray was using force against him to effectuate an unlawful seizure, a reasonable jury could conclude that the use of force against him was gratuitous.

## IV.  CONCLUSION

A reasonable jury could find that, by intruding into Robert Reed's home without a warrant and without any exigent circumstances to excuse their warrantless entry, Curtis and Gray committed a constitutional violation.  It was clearly established before the date of their intrusion that a warrantless entry without exigent circumstances was unconstitutional.  A reasonable jury could also find that it was a constitutional violation to seize Reed from his home without a warrant, and it was clearly established that such an action violated the Fourth Amendment. Finally, a reasonable jury could find that Curtis violated Reed's constitutional right to be free from excessive force when he pointed his gun at Reed's head and that Gray violated Reed's right to be free from excessive force when he pulled Reed into the driveway and pushed him against the car.  It was clearly established that using force against an individual who is not actively resisting the police is unconstitutional.

For the above reasons, we **AFFIRM** the district court's denial of qualified immunity to both Curtis and Gray on the unlawful-entry, false-arrest, and excessive-force claims.

————————————————————

**CONCURRENCE / DISSENT**

————————————————————

ROGERS, Circuit Judge, concurring in part and dissenting in part. I dissent from the holdings that by entering the house and seizing Reed the officers in this case violated clearly established constitutional law.

Several facts in the record supported the officers' belief that exigent circumstances justified a warrantless entry. Dispatch received a 911 call from a neighbor, Jennifer, who reported a physical and verbal altercation happening outside of a specific address, 7 South Cottonwood. The call was not anonymous. Officer Curtis later called back and spoke with Jennifer himself. When the officers knocked on the front door of 7 South Cottonwood, they encountered Reed, who was "slurring his words" and "unable to follow simple directions," causing them to reasonably believe that he was intoxicated. Officer Curtis also noticed a "timid" woman standing towards the back of the house. Yet Reed refused to let officers speak to that woman or to others in the home, even after the officers explained to Reed that they were responding to a report of domestic violence.

The officers in this case clearly believed that—given the report of the sounds of domestic violence at a particular address—they could go to the door and request to speak with adults in the house, and that, faced with a flat refusal and obstruction, they could enter the house for the limited purpose of asking the other inhabitants to speak briefly with them. Indeed, the officers warned Reed that his refusal to let them speak with others in the home would provide "exigent circumstances" for a warrantless entry. They acted upon that belief. Indeed, as the district court recognized, "at no point did [Officer] Gray ask Reed to allow the officers entry into his home. [Officer] Gray only asked that the other adults come to the front door to speak with him."

Officers Gray and Curtis are entitled to qualified immunity unless the law is clearly established that entry for such a limited and reasonable purpose was forbidden by the Constitution. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). No such clearly established prohibition has been shown.

First, cases where we have found qualified immunity cannot clearly establish a constitutional violation by negative inference. That the majority could distinguish these cases, in other words, does not lend any affirmative support to its qualified immunity analysis. For instance, in *Schreiber v. Moe*, the holding that exigent circumstances justified a warrantless entry when an officer responded to a potential domestic dispute, heard shouting, and received "a slew of profanities" from the homeowner, does not imply that anything less falls short. 596 F.3d 323, 330 (6th Cir. 2010); *see also Baker v. City of Trenton*, 936 F.3d 523, 532 (6th Cir. 2019); *Morgan v. Fairfield County*, 903 F.3d 553, 564-65 (6th Cir. 2018); *Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003); *Fineout v. Kostanko*, 780 F. App'x 317, 326 (6th Cir. 2019) (per curiam).

Second, cases involving searches to obtain physical evidence or to make an arrest are categorically different. *E.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *Coffey v. Carroll*, 933 F.3d 577, 587 (6th Cir. 2019); *Goodwin v. City of Painesville*, 781 F.3d 314, 319, 332 (6th Cir. 2015). Here the police did not seek to search the house, or arrest anybody. They only wanted to briefly interview the inhabitants. This is a pretty unintrusive request. If Reed had merely permitted the woman in the house to come to the door and talk with the police, as they politely requested, there would have been no entry at all. It was reasonably clear to the police that Reed did not want the woman to have the chance to speak with the police. Moreover, the record shows that the other adults in the home ultimately complied with the officers' request to speak with them outside of the house in a polite and congenial way.

The few cases relied upon by Reed which both held in favor of the plaintiffs and did involve a domestic disturbance call are substantially different. For instance, *Barton v. Martin* is different because the 911 call there reported not domestic violence but the shooting of a cat. 949 F.3d 938, 948 (6th Cir. 2020). After officers responded to the scene, the homeowner admitted to having a BB gun, denied shooting the cat, and declined to come out of his house. *Id.* The court held that these facts did not amount to exigent circumstances justifying a warrantless entry. *Id.* at 949. We held that "[w]ithout additional evidence of a threat against the police or bystanders, a report of an armed suspect inside his home does not justify warrantless entry." *Id.* Here the

exigency was clearly more than a report of an armed suspect who may have shot a cat: officers responded to a report of domestic physical abuse.

*Williams v. Maurer* is also substantially different from Reed's case. 9 F.4th 416 (6th Cir. 2021). To deny qualified immunity we relied on the anonymous nature of the report, and the fact that the 911 caller later called 911 again and "retracted her identification of Apartment 103 as the site" of the disturbance. *Id.* at 433. Officers saw broken glass outside of Apartment 103 and heard screaming in a different apartment. *Id.* at 434. When officers knocked on the door of Apartment 103, the homeowner declined to engage with them. *Id.* The court concluded this mix of facts did not justify a warrantless entry. *Id.* Here an identified caller was consistent in identifying the location.

Lastly, although *Cummings v. City of Akron* did involve a warrantless entry following a report of a domestic disturbance, the asserted exigency was hot pursuit of a fleeing felon, the felony being the resident's having slammed the door on the officer's foot. 418 F.3d 676, 686 (6th Cir. 2005). Our holding that there was no objectively reasonable basis for hot pursuit of a fleeing felon, *id.* at 686–87, says little about merely insisting on talking to a possible domestic abuse victim.

In sum, plaintiff has not adequately shown clearly established law that prevents officers, on reasonable suspicion of domestic physical abuse, from insisting on talking with possible victims. The law of qualified immunity supports this conclusion. In *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam), for instance, the Supreme Court cautioned against defining the right at too high a level of generality in the Fourth Amendment context. In *Gradisher v. City of Akron*, 794 F.3d 574, 585 (6th Cir. 2015), we held that the law not clearly established when "no law confirm[ed] that the officers . . . were clearly wrong for deciding to enter on those bases." Furthermore, in *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996), we reasoned that "[e]ven if the officers' belief that someone within [a residence] could be in danger is a close question, the officers are entitled to the benefit of the doubt under the qualified immunity standard."

For similar reasons, Reed's false arrest claim also fails on the clearly established prong. The district court borrowed its clearly established analysis on the false arrest claim from the warrantless entry claim, reasoning that it "was clearly established at the time of [Officer] Gray and [Officer] Curtis's alleged violation" that "absent an exigent circumstance, police may not detain someone inside their home." As explained above, the absence of exigent circumstances in this case was not clearly established under existing case law.

However, I agree with the majority's opinion that at this stage the officers were not entitled to qualified immunity for engaging in the degree of force that they employed—rough handling and briefly pointing a weapon at Reed's head—and a jury should resolve those issues.